**Application of Eli SALEM et al.**

**Patent Appeal No. 76–623.**

United States Court of Customs
and Patent Appeals.

April 21, 1977.

David A. Anderson, Chicago, Ill. (Hume, Clement, Brinks, Willian, Olds & Cook, Ltd., Chicago, Ill.), attys. of record, for appellants.

Joseph F. Nakamura, Washington, D. C., for the Commissioner of Patents, Gerald H. Bjorge, Washington, D. C., of counsel.

Before MARKEY, Chief Judge, and RICH, BALDWIN, LANE and MILLER, Judges.

BALDWIN, Judge.

This appeal is from the decision of the Patent and Trademark Office (PTO) Board of Appeals (board) affirming the rejection of claims 1 to 11, all of the claims of application serial No. 310,383, filed November 29, 1972 for "Regeneration of Anion Exchange Resins." This application is for the reissue of patent No. 3,645,921, which was granted February 29, 1972 on an application filed April 20, 1970. We reverse.

## The Invention

Appellants describe the invention as "an improved method for converting strong-base anion exchange resin having quaternary ammonium active groups from the monovalent anion form to the hydroxide form."

Strong-base anion-exchange resins of commercial importance contain quaternary ammonium groups bonded to a cross-linked, three-dimensional polymer matrix, e. g., poly (styrene-divinylbenzene), the exchangeable anions often being hydroxide ions. In applications such as water deionization, for example, these resins are exhausted by conversion from the hydroxide form to another monovalent anion form. The present invention provides a four step method in which the exhausted resin is regenerated, i. e., reconverted to the hydroxide form for further use.

Claim 1 of the original patent sets forth the invention in terms which substantially correspond to the description thereof contained in the specification, and reads:

1. A method for converting strong-base anion exchange resin having quaternary ammonium active groups from the monovalent anion form to the hydroxide form comprising: passing a solution of polyvalent anions through a first batch of said resin, whereby to displace said monovalent anions with said polyvalent anions; subsequently passing a solution of alkali metal hydroxide through said resin to convert said resin to the hydroxide form, and to produce an effluent solution of hydroxide anions and divalent anions; neutralizing said effluent with an acid containing polyvalent anions whereby to form a neutralized solution of polyvalent anions; and passing said neutralized solution through a second batch of said resin in the monovalent anion form.

## The Reissue Application

The gist of appellants' reason for seeking a reissue of patent No. 3,645,921, as set forth in the declaration, is that the patent is wholly or partly inoperative or invalid by reason of a defective specification, and by reason of the patentee claiming less than he had a right to claim. More specifically, the declaration states:

We further declare that the specification is defective for the reason that the term "polyvalent anions" is used to describe certain anions, specifically disclosed in the specification, which are not themselves polyvalent, but which form a source of polyvalent anions. Such anions include the bisulfate, bicarbonate, and monobasic phosphate anions.

We further declare that we claimed less than we had a right to claim by limiting claims 1–9 to "passing a *solution of polyvalent anions* through a first batch of said resin . . .," whereas the specification discloses that certain monovalent anions, which provide a source of polybasic anions, can also be employed.

We further declare that the foregoing errors in the specification and claims arose from a failure of our attorney to fully realize that certain of the anions disclosed are not "polyvalent anions". This error was not detected by applicants because the specification discloses a number of monovalent anions which provide a source of polyvalent anions, and applicants executed the application on the belief that this disclosure was adequately embraced by the entire specification and claims.

We further declare that the above-described errors arose without any deceptive intention on the part of applicants; and that such errors were originally discovered as a result of their being called to the attention of applicants' attorney by the British Patent Office, where an equivalent application is pending. [Emphasis in original.]

In an effort to cure the alleged insufficiency in the claims, appellants amended claims 1 and 7[1] to read as follows:[2]

1. A method for converting strong-base anion exchange resin having quaternary ammonium active groups from the monovalent anion form to the hydroxide form comprising: passing a [solution] *source* of polyvalent anions through a first batch of said resin, whereby to displace said monovalent anions [with said polyvalent anions]; subsequently passing a solution of alkali metal hydroxide through said resin to convert said resin to the hydroxide form, and to produce an effluent solution of hydroxide anions and [divalent] *polyvalent* anions; neutralizing said effluent with an acid containing *a source of* polyvalent anions whereby to form a neutralized [solution] *source* of polyvalent anions; and passing said neutralized [solution] *source of polyvalent anions* through a second batch of said resin in the monovalent anion form.

7. A method of converting strong-base anion exchange resin having quaternary ammonium active groups from the monovalent anion form to the hydroxide form comprising: passing a [solution] *source* of polyvalent anions through a first batch of said resin, said solution having a concentration not exceeding about 0.5 normal, to displace said monovalent anions [with polyvalent anions]; subsequently passing a solution of alkali metal hydroxide through said resin to convert said resin to the hydroxide form and to produce an effluent comprising an alkali metal hydroxide solution; neutralizing at least a portion of said effluent with an acid containing *a source of* polyvalent anions, whereby to form a neutralized effluent [solution] *source* of polyvalent anions; and passing said neutralized effluent [solution] *source of polyvalent anions* through a second batch of said resin in the monovalent anion form whereby to displace said monovalent anions.

---

1. It is apparent from the record that the alleged defects in the specification and insufficiency in the claims arise from the use, in both, of the expression "solution of polyvalent anions." Accordingly, the amendments to the claims introduced to correct the purported shortcomings of the quoted expression substantially correspond to the amendments to the specification.

Consequently, the latter have not been reproduced inasmuch as they would only serve to unnecessarily lengthen the opinion.

2. Additions and deletions with respect to the original claims are indicated in italics and brackets, respectively.

### Proceedings in the PTO

Initially, the specification was objected to, and claims 1 to 11 [3] rejected under 35 USC 251. [4] The only explanation of the examiner's position was the brief comment that:

"[s]ource of" is new matter relative to "solution containing" as is "polyvalent" relative to "divalent." [5]

Unswayed by appellants' traversal of the rejection, the examiner repeated and made final the objection/rejection for reasons already of record.

In an amendment filed pursuant to 37 CFR 1.116, appellants endeavored to further explain the expression "source of polyvalent anions" by inserting the following language (italicized sentence) into the portion of the specification describing the substances used to provide polyvalent anions, which now reads:

As previously stated, numerous *sources of* polyvalent anions may be employed in the method of the present invention. *These include ionizable substances that produce polyvalent anions in solution, as well as those that produce monovalent anions, such as bisulfate and bicarbonate, which in turn, are ionizable to form polyvalent anions.* These polyvalent anions are supplied by an inorganic compound, which should be a subsance [sic] that readily ionizes in dilute aqueous solutions. Examples of suitable ionized substances are sodium sulfate, sodium carbonate, potassium sulfate, potassium carbonate, sodium phosphate, potassium bisulfate, sodium bicarbonate, monobasic sodium phosphate, * * * and zinc sulfate. Any water-soluble inorganic salt that ionizes in a dilute aqueous solution to provide polyvalent. anions, particularly sulfate, carbonate, or phosphate anions, and that does not form insoluble substances with the monovalent anions displaced from the anion exchange resin may be employed in the process.

In his Answer, the examiner stated that all of the claims "stand finally rejected under 35 USC 132 [6] as being drawn to new matter," and cited for the first time the following definitions from *Webster's Seventh New Collegiate Dictionary* (1963):

*solution* * * * a liquid containing a dissolved substance * * * ;

and

*source* * * * a generative force * * * a point of origin * * *.

On the basis of these definitions, the examiner asserted that:

"Source" is *clearly broader* than and *possibly generic to* "solution", i. e., a source of ions *could be* a solution of ions, but it *could also be* any other "point of origin" of ions. [Emphasis added.]

and concluded that:

[t]he proposed changes are thus seen to broaden and/or change the meaning of the disclosure generally and the claims specifically, and they are thus new matter.

In response to appellants' argument that the expression "solution of polyvalent anions" is unduly narrow and may be construed to exclude the disclosed acid salts (e. g., potassium bisulfate and sodium bicarbo-

---

**3.** Because appellants have failed to argue separately the patentability of any claims other than claim 1, we have treated all claims as standing or falling with claim 1.

**4.** This section provides, in part:

Whenever any patent is, through error without any deceptive intention, deemed wholly or partly inoperative or invalid, by reason of a defective specification or drawing, or by reason of the patentee claiming more or less than he had a right to claim in the patent, the Commissioner shall, on the surrender of such patent and the payment of the fee required by law, reissue the patent for the invention disclosed in the original patent, and in accordance with a new and amended application, for the unexpired part of the term of the original patent. No new matter shall be introduced into the application for reissue.

**5.** The rejection arising out of the substitution of "polyvalent" for "divalent" in claim 1 was subsequently withdrawn in the examiner's Answer.

**6.** There is neither an explanation nor an apparent reason for the shift in the statutory basis of rejection from 35 USC 251 to 35 USC 132.

nate), which cannot strictly be regarded as producing a solution of polyvalent anions, the examiner argued:

> Except in the presence of a very high (theoretically an infinite) concentration of acid * * * there is always a finite concentration of the divalent ion carbonate [sic carbonate ion?] present in a solution of sodium bicarbonate. Thus, the solution originally disclosed *is a solution* of divalent anions. It is not necessary to introduce the broader term "source" to render the original disclosure correct. * * * *It is thus seen that the original disclosure is not in error.* The proposed change would thus not be corrective. It would rather be additive. [Emphasis— first occurrence—in original. Emphasis—second occurrence—added.]

The board expressed the following view in affirming the new matter rejection:

> Although the original disclosure indicates that certain readily ionizable inorganic compounds containing monovalent anions may be employed in the process, there is no support in the original disclosure for the proposition that all sources of polyvalent ions [e. g., $SO_2$, $H_2SO_4$, etc.] may be so utilized. However, appellants' amendatory terminology encompasses same. That being the case, the employment of the amendatory language relating to the term "source" herein is not considered to comply with the requirements of 35 USC 251. [Bracketed material in quote.]

### Issues

As stated by the board:

> The sole issue on appeal in this application for reissue is the examiner's rejection of all the claims * * * as being drawn to new matter in the substitution of the terms "source," "a source of," and "source of polyvalent anions" for the word "solution" in independent claims 1 and 7 * * *.

The single issue framed by appellants in their main brief is essentially the same. In addition to the issue of new matter, however, the solicitor's brief asserts that the following issue is also raised by the opinions and decisions of the examiner and board:

> [W]hether the Commissioner is authorized to reissue appellants' original patent under 35 U.S.C. 251 where the examiner has deemed that appellants have committed no "error" in that patent "by reason of a defective specification" or "claiming * * * less than * * * [they] had a right to claim in the patent." [Deletions in solicitor's brief.]

### Appellants' Position

Appellants' position on the new matter issue is simply that it cannot constitute new matter to insert into the reissue application the expression "source of polyvalent anions," which is defined in terms of substances that are expressly set forth in the original patent.

With regard to whether or not the insufficiency in the claims of the original patent was the result of error, appellants assert in their reply brief that an ambiguity exists in the claims of the original patent and that amendment of the claims to clarify the scope thereof should be permitted by means of reissue instead of having to rely on implication or litigation.

### Solicitor's Position

With respect to the new matter issue, the solicitor agrees with the board's holding that appellants' amendatory language embraces far more than appellants describe in their original patent. The solicitor's position, as set forth in his brief, is summarized as follows:

> In short, the specification of appellants' original patent does not explicitly, implicitly or inherently describe the broad concepts which are now set forth in appellants' specification and claims.

On the question of "error," the solicitor contends that the examiner "voiced a second ground [of rejection] supporting his decision rejecting the claims under 35 U.S.C. 251" in arguing that the claims of the original patent encompass the use of acid salts, and, therefore, the original dis-

closure is not in error. The solicitor's argument continues:

The Board did not disagree with or reverse the examiner's holding, and appellants have not controverted or challenged the examiner's factual findings * * * [which] findings should be accepted as correct, no subsequent evidence to the contrary appearing. [Footnote omitted.]

The argument concludes:

Appellants have failed to comply with 35 U.S.C. 251 because they do not meet the initial, necessary condition that their original patent, through "error," be inoperative or invalid by reason of a defective specification or by reason of their claiming less than they had a right to claim.

## OPINION

Regardless of its mode of expression, it appears that the position of the Patent and Trademark Office is simply that appellants' original specification contains no description of the concept of employing a source of polyvalent anions in a method for regenerating strong-base anion exchange resin, the subject matter of claims 1 and 7. In other words, notwithstanding that the rejection was expressed in terms of "new matter," it is tantamount to a rejection on the basis that the claimed subject matter has not been described in the manner required by 35 U.S.C. 112, first paragraph.[7] *In re Wertheim*, 541 F.2d 257, 265 (CCPA 1976).

■ In maintaining that the subject matter claimed in appellants' reissue application is not described in the original patent, however, the PTO has the initial burden, as stated in *Wertheim*, of presenting evidence or reasons why persons skilled in the art would not recognize in the disclosure of the original patent a description of the invention defined by the reissue claims. The

7. Appellants' reissue application has been filed within the statutory time period set forth in the following provision of 35 U.S.C. 251:

No reissued patent shall be granted enlarging the scope of the claims of the original patent unless applied for within two years from the grant of the original patent.

determinative question on this appeal is whether or not the PTO has met this burden.

As noted previously, in describing the sources of polyvalent anions which may be employed in the claimed method, appellants' reissue application states:

These polyvalent anions are supplied by an inorganic compound, which should be a subsance [sic] that readily ionizes in dilute aqueous solutions. Examples of suitable ionized substances are sodium sulfate, * * * potassium carbonate, * * * potassium bisulfate, sodium bicarbonate, * * *.

According to appellants, this description of "sources of polyvalent anions," given in terms of substances that were set forth in the original patent, avoids running afoul of the statutory proscription against new matter.

■ The examiner appears to have taken the position that although appellants may have given the expression at issue a special meaning in the reissue specification, these limitations cannot be read into the expression as it appears in the appealed claims. Therefore, the examiner has concluded that the expression should be read in the broader sense set forth in the quoted excerpt from Webster's Dictionary. However, as this court long ago observed:

Indiscriminate reliance on definitions found in dictionaries can often produce absurd results. * * * One need not arbitrarily pick and choose from the various accepted definitions of a word to decide which meaning was intended as the word is used in a given claim. The *subject matter*, the context, etc., will more often than not lead to the correct conclusion. [Emphasis added. *Liebscher v. Boothroyd*, 258 F.2d 948, 951, 46 CCPA 701, 705 (1958).]

Aside from this provision, we deem reissue law to have no bearing on the present controversy. *In re Panagrossi*, 277 F.2d 181, 47 CCPA 904 (1960). The issue is the same as if the amendatory language had been presented during the prosecution of the original application. *In re Simon*, 302 F.2d 737, 49 CCPA 1065 (1962).

Thus, in determining the meaning of the expression "source of polyvalent anions" as used in the context of the present application, we must look not to the dictionary but rather to the art or technology to which the claimed subject matter pertains. In doing so, we must give due consideration to the interpretation that one of ordinary skill in the art would give the terminology in question.

Considering first the art to which the claimed subject pertains, we note the following definition from 11 *Kirk-Othmer Encyclopedia of Chemical Technology*, 871 (2d ed. 1968), of which we may take judicial notice, *In re Hartop*, 311 F.2d 249, 50 CCPA 780 (1962):

> Ion exchange may be defined as the reversible interchange of ions between a solid and a *liquid phase* in which there is no permanent change in the structure of the solid. The solid is the ion-exchange material. [Emphasis added.]

Hence, the very nature of the technology involved herein imposes certain limitations on the claims. Accordingly, to the extent that the objection to the amendatory language voiced by the examiner implies that the "source of polyvalent anions" which is passed through the resin may be in the gaseous or solid phase, it appears that the objection is unfounded in that it is inconsistent with the above definition.[8]

■ With respect to the interpretation that one of ordinary skill in the art would give to the expression "source of polyvalent anions," we apply the principle that claims of a patent application

> are to be construed in the light of the specification and the understanding thereof by those skilled in that art to whom they are addressed. [Emphasis

added. *In re Myers*, 410 F.2d 420, 425, 56 CCPA 1129, 1135 (1969).]

It appears that the broad interpretation given the amendatory language by the examiner and board is unreasonable as well as unwarranted in that it obviously fails to take this principle into account. In this regard we note that nowhere in the reissue application is it stated, either expressly or impliedly, that *any* source of polyvalent anions can be used in carrying out appellants' method. Consequently, we see no reason why one skilled in the art would read the expression at issue in its broad dictionary sense.

■ In our view, one skilled in the art of ion exchange, upon reading the claims at issue in light of the specification, would consider the expression "source of polyvalent anions" employed therein to refer to ionizable compounds capable of displacing monovalent anions on an anion-exchange resin, which compounds must perforce be in solution.[9] For example, in describing the operating conditions for the method, the amended specification states:

> The amount of *solution* containing *a source of* polyvalent anions that is employed should be sufficient to convert at least about 80% of the ion exchange sites [to the polyvalent salt form prior to treatment]. [Emphasis—first occurrence —added. Emphasis—second occurrence—in original. Bracketed material in quote.]

Moreover, despite the fact that appellants have substituted the expression "source of polyvalent anions" for "solution containing divalent anions," the sentence in which the change was made reads *in full* as follows:

> The [solution containing divalent] *source of polyvalent* anions is ordinarily

**8.** We recognize that the *Condensed Chemical Dictionary* (8th ed. 1971) provides a definition of ion exchange which suggests that ions may be exchanged between a solid phase and a gaseous phase. Upon close reading of the complete definition, however, it appears that the specific applications of ion exchange cited therein, in which gases are treated for the removal of a particular component, involve adsorption in contradistinction to an actual exchange of ionic species. As pointed out in Kirk-Othmer, there are uses for ion-exchange materials which do not depend on the interchange of ions.

**9.** Claims need not recite limitations which one of ordinary skill in the art, to whom the specification and claims are directed, would consider obvious. *In re Skrivan*, 427 F.2d 801, 806, 57 CCPA 1201, 1207 (1970).

fed to the resin bed at a rate corresponding to about 1 to 5 gallons of *solution* per square foot of cross section of the resin bed per minute. [Emphasis—first occurrence—in original. Emphasis—second occurrence—added. Bracketed material in quote.]

The paragraph continues:

Generally, the total amount of inorganic salt *solution* delivered to the resin should correspond to about 4 to 8 pounds of the inorganic compound per cubic foot of resin. [Emphasis added.]

Thus, we believe that one skilled in the art would regard the expression "source of polyvalent anions" to be no more than a shorthand expression referring to solutions of ionizable compounds of the type disclosed (including acid salts) which are capable of displacing monovalent anions present on a strong-base anion-exchange resin, in accordance with appellants' method.

It is worthy of note that synthetic anion-exchange resins have been produced for more than twenty-five years. In that time the mechanism by which they function has been thoroughly investigated. Consequently, the accumulated knowledge in this art with respect to compounds capable of effecting an exchange of ions therewith should be substantial. Therefore, we see no need for—nor any benefit to be derived from—a detailed listing of these compounds, inasmuch as appellants' contribution to the art lies in the overall combination of individual steps by which strong-base anion-exchange resins may be economically regenerated, and not in the particular solutions of ionizable compounds which may be used therein.

Our decision has been influenced substantially by the fact that nowhere in the record before us does the examiner attempt to specify exactly what is now encompassed by the amended specification and claims that

was not encompassed by the original patent. Moreover, the examples of sources of polyvalent anions which are cited by the board as allegedly unsupported in the original disclosure, i. e., sulfur dioxide and sulfuric acid, fail to persuade us that such is the case inasmuch as both of these substances do indeed fall within the ambit of the statement in the original specification that:

These polyvalent anions are supplied by an inorganic compound, which should be a subsance [sic] that readily ionizes in dilute aqueous solutions.

Furthermore, the solicitor's suggestion at oral argument that "source of polyvalent anions" includes other anion-exchange resins, which are also unsupported by the original disclosure, appears to be of dubious validity in light of the definition of ion exchange set forth above.

In view of the failure of the PTO to present any compelling evidence or reasons to the contrary, we must conclude that persons skilled in the art of ion exchange would recognize in the disclosure of the original patent a description of the invention set forth in the appealed claims.[10]

Finally, we cannot agree with the solicitor's contention that the examiner voiced a second ground of rejection, separate from the new matter rejection, in arguing that the claims of the original patent encompass the use of acid salts, and, therefore, that the original disclosure is not in error.

It is apparent from the record that no separate ground of rejection was intended by the examiner. It is also apparent that the board did not consider a second ground of rejection to have been raised, as is evidenced by the board's statement of the issue, quoted above.

Although the examiner did assert that the original disclosure is not in error, as

---

10. We see no reason for appellants' substitution of the expression "acid containing a source of polyvalent anions" for "acid containing polyvalent anions" in the specification and claims of the reissue application. Considering that the function of the acid in appellants' method is simply to neutralize the effluent from the resin,

and to provide polyvalent anions to the resultant solution, it appears that the original language was correct. In any event, we do not believe that the amended expression would be interpreted by one skilled in the art to include subject matter not disclosed in the original patent.

indicated above, the obvious inference suggested thereby is that because the claims of the original patent already encompass the subject matter appellants seek to include by reissue, appellants have committed no error; thus, the introduction of any new language which may be construed to broaden the scope of the invention must constitute new matter.

■■ Had it been the examiner's intent to raise a separate ground of rejection based on the alleged lack of error in the original patent, it should have been raised in a direct challenge to the sufficiency of appellants' reissue declaration, and not as a "make weight" argument in the context of a new matter rejection. *Cf. In re Clark*, 522 F.2d 623 (CCPA 1975). Having neglected to do this, a second ground of rejection based on lack of error was not raised below. Accordingly, the solicitor's attempt to raise the issue on appeal must fail. *In re Armbruster*, 512 F.2d 676 (CCPA 1975).

■ In conclusion, in the interest of judicial economy, we feel constrained to comment on the question of appellants' error or lack thereof, inasmuch as our doing so may avert the bringing of a second appeal in this case. It is the express purpose of 35 U.S.C. 251 to permit an applicant who has claimed less than he had a right to claim in the original patent to enlarge the scope of the claims thereof to encompass additional, originally disclosed subject matter, provided of course, that the other provisions of the section are satisfied. One of the provisions is that the insufficiency in the claims arise through error without any deceptive intention. In our view, it is consonant with the above purpose in cases where the original patent claims are such that reasonable men could differ over the interpretation, and thus the scope thereof, one interpretation being too restrictive, to permit an applicant to remove the ambiguity by redrafting the claims. In such cases, the ambiguity is a defect resulting from error without any deceptive intention. In the present case, despite the examiner's "factual findings" that the subject matter sought to be included by reissue is already

encompassed within the claims of the original patent, we agree with appellants. The expression "solution of polyvalent anions" could be interpreted to exclude solutions of acid salts, inasmuch as chemists normally speak of solutions in terms of the predominant ionic species present therein. In the case of a solution of sodium bicarbonate, for example, the predominant species is not the polyvalent carbonate anion, but the monovalent bicarbonate anion. Therefore, appellants should be permitted to amend their claims to include subject matter which was obviously intended to be included within the claims, and in so amending, eliminate the ambiguity present in the original claims.

Accordingly, the decision of the board is *reversed*.

REVERSED.